UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) No. 22-CR-30021-SEM-KLM |
| MICHAEL HENDRICKS, | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

KAREN L. McNAUGHT, U.S MAGISTRATE JUDGE:

This matter comes before the Court for a report and recommendation on a motion to suppress statements defendant made to the FBI on April 18, 2022 [d/e 53]. For the reasons set forth herein, this Court recommends the motion be DENIED.

## PROCEDURAL BACKGROUND

Defendant has moved to suppress the statements he made shortly after being arrested. Investigating officers interviewed defendant on April 18, 2021, in a small government office after transporting him from his home where the arrest was made pursuant to a warrant.

Defendant contends because of an on-going medical emergency related to his long-standing history of diabetes, he was unable to provide a knowing and voluntary waiver of any warnings he was given pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). The Government contends defendant was not coerced into waiving his Miranda rights or providing a confession [d/e 59].

More specifically, defendant alleges in his Motion to Suppress [53] that when he was arrested, he had just awakened, after which he was met at the door of his residence

by police officers whose guns were drawn [53, ¶5]. The motion alleges defendant believed his blood sugar was high when he awoke, which can be illustrated by medical records created several hours after the arrest when defendant was booked in the Christian County Jail [53, ¶5].

The Government responded to the Motion to Suppress [59] claiming defendant voluntarily, knowingly, and intelligently made statements after being given *Miranda* warnings [59, pp. 4-5]. In its response, the Government contends defendant was provided with warnings which included that he must understand his rights; he had the right to not speak or could stop answering questions posed by the investigators at any time; he had the right to speak with an attorney prior to and while he was being questioned; and, if defendant could not afford counsel, an attorney would be appointed upon request [59, pp. 7-12]. The Government attached a copy of the written waiver warnings signed by defendant [59-1].

Defendant requested an evidentiary hearing on his motion to suppress [53], which was commenced on April 6, 2023. Because the evidence was unable to be completed on April 6, 2023, the matter was continued to April 20, 2023. The parties completed the evidence on April 20, 2023.

The parties agree the Government has the burden of proving by a preponderance of the evidence that the defendant's waiver of any *Miranda* statement was knowingly, intelligently, and voluntarily made [R. 4/6/23, 3:10:48]. *See Lego v. Twomey,* 404 U.S. 477, 489 (1972)(the government bears the burden of proving the voluntariness of a defendant's statement by a preponderance of the evidence); *United States v. Bailon*, 60 F.4th 1032, 1037 (7th Cir. 2023); *United States v. Quiroz*, 874 F.3d 562, 567 (7th Cir.

2017).

## FACTUAL BACKGROUND

Defendant alleged he was interviewed by FBI Special Agent Anthony Wright and Illinois State Police Special Agent Lyle Bloomfield after being arrested [d/e 53, ¶1]. According to the motion, defendant was taken to City Hall in Morrisonville, Illinois [d/3 53, ¶2]. The interview was audio recorded and lasted 2 hours and 6 minutes [d/e 53, ¶¶2, 3, Exhibit 2]. Defendant has diabetes [d/e 53, ¶5(b)], which is confirmed by the medical records filed with his motion to suppress [d/e 56, 57].

Special Agents Wright and Bloomfield offered evidence in support of the Government. Special Agent Wright has been employed by the FBI since 2019 [R. 4/6/2023 Tr. p. 3].[1] Special Agent Bloomfield has been a Special Agent in investigations with the Illinois State Police for approximately three years [R. 4/6/2023 Tr. p. 31]. Prior thereto, he was a deputy with the Morgan County Sheriff's Department and a patrol trooper with the Illinois State Police [R. 4/6/2023 Tr. pp. 31-32]. Both officers correctly identified the defendant at the suppression hearing [R. 4/6/2023 Tr. pp. 5, 32].

The parties agree that on April 18, 2022, approximately 20-30 officers executed a search warrant at defendant's residence at around noon [R. 4/6/2023 Tr. pp. 5-6, 20-21, 44, 70-71]. The defendant had been sleeping and was awakened by officers executing the warrant [R. 4/6/2023 Tr. pp. 45, 70]. Some of the officers possessed assault rifles [R. 4/6/2023 Tr. pp. 21, 70], although the door to defendant's home was not breached, because a housemate provided a key to the door [R. 4/6/2023 Tr. p. 21]. When officers knocked on the door, defendant eventually appeared and was allowed to dress [R.

---

[1]Citations to the page numbers of the Record are taken from the unofficial RealTime transcripts.

4/6/2023 Tr. pp. 7, 22, 34, 70-7; 4/20/2023 Tr. p. 15]. According to defendant, the last insulin he had administered was at approximately 3:30 or 4:00 a.m. on the day of his arrest [R. 4/6/2023 Tr. p. 71; R. 4/20/2023, Tr. p. 6]. During a protective sweep of defendant's home, he was handcuffed [R. 4/6/2023 Tr. pp. 22, 71].

At the residence, Special Agent Wright asked defendant if he was okay, but did not ask any investigative questions [R. 4/6/2023 Tr. pp. 23]. Defendant was later transported approximately one mile to the Morrisonville City Hall [R. 4/6/2023 Tr. pp. 7-8, 20, 22, 34] where distractions were minimal. At approximately 1:00 p.m. on April 18, 2022, defendant's handcuffs were removed, and Special Agents Wright and Bloomfield began the interview [R. 4/6/2023 Tr. pp. 8, 9, 25, 22]. The interview was audio recorded [9]. Agent Wright does not recall prior to the recorded interview whether defendant indicated he was diabetic or had not taken his medications that day [R. 4/6/2023 Tr. pp. 24].

During the interview, defendant was closest to the door of the interview room [R. 4/6/2023 Tr. pp. 8-9]. At approximately 1:09 p.m., before any investigative questioning, defendant was provided by the interviewing officers with *Miranda* warnings orally and in writing [R. 4/6/2023 Tr. pp. 11-12; Government Exhibit #2]. He orally read and affirmatively indicated he understood his rights and was willing to answer questions without an attorney being present [R. 4/6/2023 Tr. pp. 12-13, 35-36; Government Exhibit #2]. Defendant did not ask any questions and signed the *Miranda* warnings form [R. 4/6/2023 Tr. pp. 13, 35-36]. The investigating officers had no concerns about whether the defendant understood the form or the warnings on the form [R. 4/6/2023 Tr. pp. 13, 14].

At the evidentiary hearing, the audio recording of defendant's interview was entered into evidence without objection [R. 4/6/2023 Tr. pp. 10; Government Exhibit #1]. The interview lasted approximately 2 hours and 6 minutes [R. 4/6/2023 Tr. pp. 14; Government Exhibit #1].

Defendant stated he has uncontrolled sugar diabetes, coronary artery disease, COPD, and black lung and has been insulin dependent for the last twenty years [R. 4/6/2023, Tr. pp. 68-69; 4/20/2023, Tr. pp. 3-4]. Defendant testified that, as a diabetic, if he is in a stressful situation, he can have loss of memory and can become violent [R. 4/6/2023 Tr. p. 69; 4/20/2023, Tr. pp. 2, 7, 8].

Defendant claims he has no recollection of the interview, although he does recall several events which preceded the interview. [R. 4/6/2023 Tr. p. 73; 4/20/2023, Tr. p. 6].[2] Defendant attributes his inability to recall the interview and events at subsequent periods of time of six months to a year after his arrest due to his blood sugar. [R. 4/6/2023 Tr. pp. 73-74; 4/20/2023, Tr. p. 12]. Defendant contends that during the interview, he was suffering from a diabetic psychosis due to high blood sugar and therefore could not knowingly and voluntarily waive his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), although defendant makes no contention he was forced to sign the *Miranda* waiver or forced to talk to investigating officers [R. 4/20/2023, Tr. p. 9]. Defendant also contends there are several events and statements he provided to the

---

[2]For example, defendant recalled each of the following events: FBI agents beat on his door; he was awakened; he grabbed his eyeglasses; the door to his home was already open; there were 20-25 officers outside of his home with AR-15 rifles pointed at the door; the men identified themselves as FBI agents; the agents did not explain why they were at defendant's house; he had not taken any insulin after 4:00 a.m. before he was awakened at noon; he was taken into custody; he was handcuffed; he was allowed to dress before he was handcuffed; he was taken to the Morrisonville City Hall; and he sat in an office at the city building [R. 4/6/2023, Tr. pp. 70-72; 4/20/2023, Tr. pp. 15-17].

interviewing officers that are defective or are nonsensical.³ The Agents indicated it is not unusual for a suspect to be evasive or not tell the truth initially 4/6/2023 Tr. p. 15, 43-44, 46]. Defendant also provides a version of events in the interview that the Government disputes.⁴

Before the interview started, Special Agent Bloomfield asked defendant if he was alright and defendant indicated he was okay [4/6/2023 Tr. pp. 41]. While the defendant was being interview, his eyes did not appear to the officers to be glazed [R. 4/6/2023 Tr. p. 17]. Defendant did not know whether he advised Special Agents Wright or Bloomfield that he was diabetic, but the audio recording of the interview does not reflect any such report [R. 4/6/2023 Tr. p. 72; Government Exhibit #1].

The officers in the interview did not threaten defendant; no physical force was used

---

³Defendant provided the following instances which occurred during the interview process: the signature on the *Miranda* form does not look like other examples of his signature [R. 4/20/2023, Tr. p. 8]; he told a story at approximately 54-58 minutes into the interview about his phone being hacked in Chicago, which was untrue [R. 4/20/2023, Tr. p. 10; Government's Exhibit #1, 57:09]; he made a statement about the devil and bones at approximately 1 hour and 15 minutes into the interview (the Court notes defendant said in responding to the agent's question of how he got started obtaining pornography, defendant responded, "the devil points you in the right direction")[R. 4/20/2023, Tr. p. 10; Government Exhibit #1, 1:15:46]; he gave the wrong combinations to his safes, but provided the place to find safe keys [R. 4/20/2023, Tr. p. 24; Government Exhibit #1,35:18-37:50]; the ages of the children in his home he provided were wrong [R. 4/20/2023, Tr. p. 24; Government Exhibit #1, 9:37]; and he found it odd that he was laughing with officers during such a serious event [R. 4/20/2023, Tr. pp. 43, 51; Government Exhibit #1, 8:06, 21:43-22:05, 22:29-23:30].

⁴For example, defendant claims he did not agree during the interview that he traded *child* pornography, and, in fact, disputed during the interview several times that he refused to agree that he traded child pornography using the KIK and SNAPCHAT applications on his cell phone [R. 4/6/2023, Tr. p. 46; 4/20/2023, Tr. pp. 17-18, *but see* Government Exhibit #1 at 50:35, 50:45, 1:08:20,1:14:08,1:14:40; 1:16:20, 1:17:08, 1:21:14, 1:21;20;  1:26:20, 1:53:50]; he did not recall using the email address of Tim Bubbles or what that meant [R. 4/20/2023, Tr. p. 21], *but see* Government Exhibit #1 at 1:33:40; and he did not recall how he started trading child pornography [R. 4/20/2023, Tr. p. 22], *but see* Government Exhibit #1 at 1:10:45-1:15:30. The Government also disputes defendant was offered and drank water at 6 minutes and 47 seconds into the interview [R. 4/6/2023, Tr. pp. 16, 30, 51-52; R. 4/20/2023, Tr. pp. 28-30, 46-47]; Government Exhibit #1, 6:47.

against defendant; and the service weapons the officers were carrying that day were not drawn during the questioning [R. 4/6/2023 Tr. pp. 14, 26-28, 36, 45, 72; 4/20/2023, Tr. pp. 41-42]. Although defendant agrees his interview was not coerced, he claims the officers misled him [R. 4/20/2023, Tr. p. 40]. Defendant did not state during the interview that he was a diabetic, needed insulin, or that his blood sugar was too high or too low [R. 4/6/2023 Tr. pp. 18, 41]. Defendant neither appeared to the officers to be under the influence of any illicit narcotics [15, 38-39] nor asked for medical treatment, medication, or food during the post-arrest interview [R. 4/6/2023 Tr. pp. 18, 41, 72; 4/20/2023 Tr. p. 27]. Defendant did not indicate to the interviewing officers that he was light-headed; thought his blood sugar was high; or needed food or medical attention [R. 4/6/2023 Tr. pp. 16-17, 28-28, 40-41, 43].

Defendant appeared alert and responsive to questions [R. 4/6/2023 Tr. p. 17]. Defendant was cooperative and appeared to the officers to comprehend the questions posed to him [R. 4/6/2023 Tr. pp. 14-15, 26-27, 39, 43]. Nothing occurred during the interview to alarm the officers or alert them that defendant had a medical condition which necessitated emergent treatment [R. 4/6/2023 Tr. pp. 18, 43-44]. At no time did defendant say that he did not understand any questions posed to him [R. 4/6/2023 Tr. p. 17; Government Exhibit #1].

According to the officers, defendant laughed appropriately with the interviewers questioning him [R. 4/6/2023 Tr. pp. 14-15, 37; [R. 4/20/2023, Tr. p. 43; Government Exhibit #1]. Additionally, the officers used an interview technique to identify with the defendant about hunting [R. 4/20/2023, Tr. p. 43]. The officers believed the answers provided to them by the defendant were appropriate to the questions posed and, in some instances, details

provided by defendant could be readily verified. [R. 4/6/2023 Tr. p. 15; Government Exhibit #1].[5] However, at times, defendant's responses seemed elusive or he deflected his conduct [R. 4/6/2023 Tr. p. 15; Government Exhibit #1].[6]

Although defendant coughed violently at approximately 31 minutes, 55 seconds into the interview, he attributed the spasm to black lung and indicated the coughing could be suppressed with smoking a cigarette [R. 4/6/2023 Tr. pp. 6, 18; Government Exhibit. #1, time: 31 minutes, 55 seconds]. Defendant did not appear to the officers to be ill. [R. 4/6/2023 Tr. pp. 15-16, 38, 40] or confused [R. 4/6/2023 Tr. p. 39]. During the coughing fit, officers asked defendant if he wanted water or medication, but defendant declined [R. 4/6/2023 Tr. pp. 16, 29, 45]. If defendant had made a request of the officers for his medication, Special Agent Wright would have obtained medical assistance for defendant [R. 4/6/2023 Tr. pp. 28].

During the hearing on April 20, 2023, defendant claimed he had "cotton mouth" or a dry sensation in his mouth, just as he had on the day when he was interviewed by Special Agents Wright and Bloomfield [R. 4/20/2023 Tr. pp. 46-47]. Defendant contended that thirst was caused by his blood sugar levels. *Id*. While defendant was on the witness

---

[5] For example, defendant provided details about the individuals who lived in the household; items in the household that might be of interest to the officers; his email addresses that officers had already identified; and his involvement in possessing pornography [R. 4/6/2023 Tr. pp. 16, 37-38, 39-40; Tr. 4/20/2023, pp. 18-21; Government Exhibit #1, 7:46, 8:06, 8:45, 8:55 9:37, 19:25-20:04, 36:45-37:50]. Defendant described the quantities and sizes of cannabis plants in his home, which were just within the legal limits [R. 4/6/2023 Tr. pp. 42-43; Tr. 4/20/2023, p. 25; Government Exhibit #1, 19:25-20:19 ]. Defendant said he traded pornography from mega links that had been verified by the investigating officers [R. Tr. 4/20/2023, p. 21; Government Exhibit #1, 1:30:50]. Defendant told officers where the key to at least one of his safes was located [R. Tr. 4/20/2023, pp. 24-25; Government Exhibit #1, 35:20-36:05]. Defendant was able to properly identify his cell phone number and carrier [R. Tr. 4/20/2023, pp. 46-47; Government Exhibit #1, 6:22, 6:41].

[6] For example, in his interview, defendant claimed his cell phone had been hacked [R. 4/6/2023 Tr. pp. 25; Government Exhibit #1, 56:56-59:30]. Defendant also said he did not send gift cards to a minor, but he may have sent photos of gift cards in exchange for an agreement for child pornography [Government Exhibit #1, 53:13-53:50].

stand at the suppression hearing, the Court inquired of defendant whether he would like water, and he indicated he would [R. 4/20/2023 Tr. p. 48]. A bottle of water was provided to the defendant during the hearing. The Court observed that defendant not only did not consume any water during the evidence or arguments, but also did not even open the water. Defendant departed the witness stand and sat at counsel table for several minutes during arguments. After the arguments were concluded, but just before the Court left the bench, his own counsel asked defendant if he wanted to drink some water before he left the courthouse, and defendant finally opened the bottle of water and took a few sips, but did not gulp or consume entire bottle of water.

## ANALYSIS

"[B]efore law enforcement officers can interrogate a suspect in custody, they must inform the suspect of his *Miranda* rights." *United States v. Thurman*, 889 F.3d 356, 364 (7th Cir. 2018); *see also Miranda v. Arizona*, 384 U.S. 436, 475 (1966). A defendant's waiver of *Miranda* rights must always be voluntary, knowing, and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *United States v. Carson*, 582 F.3d 827, 833 (7th Cir. 2009). Whether a person has validly waived his *Miranda* rights depends on the totality of the circumstances. *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009).

The Government bears the burden of proving by a preponderance of the evidence that the defendant made a voluntary, knowing, and intelligent waiver. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Lego v. Twomey,* 404 U.S. 477, 489 (1972); *United States v. Quiroz*, 874 F.3d 562, 567 (7th Cir. 2017). Courts typically look at factors such as "the defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental condition of the defendant, the attitude of the law

enforcement officials, and whether law enforcement officers used coercive techniques." *Shabaz*, 579 F.3d at 820. *See also United States v. Quiroz*, 874 F.3d 562, 567 (7th Cir. 2017). A defendant's waiver of his *Miranda* rights is valid if it is (1) " 'the product of a free and deliberate choice rather than intimidation, coercion, or deception' and is [(2)] made knowingly and intelligently, 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *U.S. v. Outland*, 993 F.3d 1017,1021 (7th Cir. 2021) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Evaluating the totality of the circumstances, the court should "look at factors such as the defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental condition of the defendant, the attitude of the law enforcement officials, and whether law enforcement officers used coercive techniques, either psychological or physical." *United States v. Bailon*, 60 F.4th 1032, 1036–37 (7th Cir. 2023), *citing United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009).

Defendant's testimony regarding his mental and medical condition during the interview was not credible. Defendant's testimony that he was suffering from diabetic psychosis and irrational behavior is inconsistent with the recording of the interview. The recording of the interview demonstrates that, throughout that interrogation, Mr. Hendricks interacted appropriately with agents conducting the interview. After signing the *Miranda* waiver, defendant immediately began answering the questions posed by the agents. *See United States v. Lee*, 618 F.3d 667, 676 (7th Cir. 2010) ("Willingness to answer questions, even in the absence of a signed waiver, can be viewed as impliedly waiving one's rights."); *United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000) (noting that the defendant, after being read her rights, "immediately began talking to the agents ... and continued to do so

for an hour"). Mr. Hendricks demonstrated independent thinking during the interview, occasionally denying the accusations made by the agents and correcting their misunderstandings. *See Smith*, 218 F.3d at 782 (noting the defendant's "independent thinking and exercise of free will"); *Quiroz*, 874 F.3d at 568 (finding that the defendant was "not a timid person in asserting his rights" (cleaned up)).

Defendant claimed he was suffering from "dry mouth" during the interview as evidenced by the fact he asked officers for a drink of water [R. 4/20/2023 Tr. p .6]. Defendant testified this occurred 6 minutes and 47 seconds into the interview. [R. 4/20/2023 Tr. p. 28]. Although defendant denies any recollection of the interview, he testified he was given a bottle of water in response to this request. *Id*. The recording of the interview does not support defendant's testimony. Defendant also testified he was behaving oddly by laughing with officers, making a reference to the devil, etc. The recording of the interview indicates defendant behaved and responded appropriately throughout the interview. The recording supports a finding defendant was in full possession of his faculties during the interview.

The testimony of Special Agents Wright and Bloomfield was credible and corroborated by the audio recording of the interview. Both officers testified there was no indication defendant was sick during the interview or was intoxicated. Defendant appeared alert and responsive. [R. 4/20/2023, Tr. p. 17]. Plaintiff was not glassy eyed and did not appear confused. *Id*.

The Seventh Circuit has held that "a confession is voluntary if, in the totality of circumstances, it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have

overcome the defendant's free will." *United States v. Gillaum,* 372 F.3d 848, 856 (7th Cir.2004) (internal quotations and citation omitted). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). "[W]e analyze coercion from the perspective of a reasonable person in the position of the suspect," (*United States v. Huerta,* 239 F.3d 865, 871 (7th Cir. 2001)), and consider the following factors: "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Id.*

In his motion to suppress, plaintiff cites *U.S. v. Brooks*, 125 F.3d 484 (7th Cir, 1997) for the proposition that impairments caused by physical conditions, drugs, and alcohol are appropriate factors for a court to consider when evaluating a *Miranda* waiver. The Seventh Circuit, while acknowledging the relevance of a defendant's mental condition to the voluntariness of a confession, called it "hornbook law" that a defendant's mental condition will not justify a finding of involuntariness in the absence of police coercion. *U.S. v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012). This point was also recognized in *Brooks*, upon which plaintiff relies. *See Brooks*, 125 F.3d at 493 ("Mr. Brooks must also demonstrate that his statement was involuntary because of official coercion").

The United States Supreme Court has also recognized, "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Colorado v. Connelly*, 479 U.S. 157, 165 (1986). In *Connelly*, it was undisputed that the defendant

confessed in response to orders from voices in his head, the Court held "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Id*. at 167. While *Connelly* involved a confession to a Denver police officer and the voluntariness of the confession was analyzed under the due process clause of the Fourteenth Amendment, the Court found the same rule applies under the Fifth Amendment. *Id*. at 169-170 ("The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion"). The purpose of excluding evidence seized in violation of the Constitution is to deter future violations. *Id*. at 166. Excluding relevant evidence in situations in which the evidence was not obtained through police misconduct "would serve no purpose in enforcing constitutional guarantees." *Id*.

The totality of the circumstances establishes that Michael Hendricks knowingly, intelligently, and voluntarily waived his *Miranda* rights. He signed a *Miranda* waiver, which accurately and clearly outlined his rights under the law. The agents gave him the opportunity to read the form before they began questioning him, and he fluently read each of his rights aloud before initialing next to each line. *See Berghuis v. Thompkins*, 560 U.S. 370, 385–86, (2010) (finding that the *Miranda* waiver was valid, in part, because the defendant "was given time to read the warnings"). Mr. Hendricks signed the bottom portion of the document, titled "Waiver of Rights," which stated that he had read and understood his rights and was prepared to answer questions without an attorney. Notably, the agents did not use any force or threats to coerce him to sign the waiver. *Id.* at 386 (finding that the defendant "d[id] not claim that police threatened or injured him" nor "that he was in any way fearful"). Plaintiff waived his rights voluntarily and knowingly.

Furthermore, the interview was not conducted in a coercive manner. The

atmosphere of the interrogation was "low key and informal." *See Thurman*, 889 F.3d at 365. The officers were polite and respectful, no weapons were drawn, and Mr. Hendricks even laughed on at least one occasion. The laughter was appropriate to the circumstances. The interview was conducted during the middle of the afternoon and lasted a little over two hours. *See Berghuis*, 560 U.S. at 386–87 (finding a valid *Miranda* waiver where a three-hour "interrogation was conducted in a standard-sized room in the middle of the afternoon").

Because Special Agents Wright and Bloomfield did not improperly coerce Mr. Hendricks into waiving his rights and the statements were voluntarily made, no bases exist to find plaintiff's statement was involuntary. *Connelly*, 479 U.S. at 167. The Government has met its burden of proving that plaintiff's statement was voluntary. Therefore, this Court recommends defendant's motion to suppress [53] be denied.

ENTERED: May 17, 2022.

<u>/s/ Karen L. McNaught</u>

KAREN L. MCNAUGHT

UNITED STATES MAGISTRATE JUDGE